DOWAGIAC LIMITED DIVIDEND HOUSING ASSOCIATION v
CITY OF DOWAGIAC

Docket No. 86974. Submitted July 8, 1987, at Lansing. Decided
December 1, 1987. Leave to appeal applied for.

Dowagiac Limited Dividend Housing Association (petitioner) built
a 120-unit apartment complex, known as Vineyard Place, in
1981. The project was completely financed with funds from the
Michigan State Housing Development Authority, which agreed
to undertake and carry the mortgage after petitioner had a
commitment from the FHA to provide housing assistance pay-
ments to support the project. The City of Dowagiac (respondent)
issued a $1,979,050 tax assessment against Vineyard Place for
the tax year 1982. Petitioner timely protested the assessment
to the Michigan Tax Tribunal and subsequently amended the
petition to include the assessments for the 1983 and 1984 tax
years. On August 2, 1985, the Tax Tribunal entered an opinion
and judgment that adopted, with some modification, respon-
dent's income approach to valuation of Vineyard Place. Peti-
tioner appealed.

The Court of Appeals held:

1. The tribunal did not err in using the value of the rent
subsidies in calculating the true cash value of Vineyard Place.

2. Petitioner's contentions that the tribunal erred in includ-
ing interest income produced by the cash reserve account under
the control of MSHDA in the total income per year of Vineyard
Place and that the tribunal erred in valuing Vineyard Place as
a going concern rather than as realty are rejected. Petitioner
failed to meet its burden of proving the existence of a separate
and intangible business value and failed to cite any authority
in support of deducting the going concern value of the business
from the true cash value of the realty or the method to be used
in measuring the intangible business value. The tribunal did
not adopt a wrong legal principle in computing the amount of
net operating income.

3. The tribunal did not err in setting the equity-yield rate

REFERENCES

Am Jur 2d, Housing Laws and Urban Redevelopment §§ 27-32.

Validity, construction, and effect of statutes providing for urban
redevelopment by private enterprise. 44 ALR2d 1414.

factor at six percent in using the mortgage-equity method for reaching a capitalization rate. Six percent was equivalent to the maximum return on investment allowed petitioner under the MSHDA agreement, and petitioner did not present evidence to the tribunal that the equity-yield factor used in computing the capitalization rate should be anything other than six percent.

4. The tribunal did not err in using a five-year holding period factor in arriving at a capitalization rate.

5. The tribunal did not adopt a wrong legal principle in using the actual government financing instrument to determine the loan interest rate factor in the mortgage-equity equation for ascertaining the capitalization rate.

6. The tribunal did not err in adopting a zero percent appreciation/depreciation factor in the mortgage-equity equation used to reach a capitalization rate.

7. The tribunal did not adopt a wrong principle in adopting respondent's overall capitalization rate.

8. The tribunal did not err in adopting the capitalization-of-income approach to determine the valuation of Vineyard Place.

9. Petitioner's contention that if it is proper to consider the subsidized nature of the complex, and it is, then the project had no value because it has been completely restricted out of the real estate market is without merit. Petitioner itself argued before the Tax Tribunal that Vineyard Place had substantial value.

Affirmed.

1. TAXATION — LOW-INCOME HOUSING — TRUE CASH VALUE — RENTAL SUBSIDIES.

The Michigan Tax Tribunal did not err in including rental subsidies provided by the federal government when calculating the true cash value of a low-income housing apartment complex under the income capitalization approach.

2. TAXATION — LOW-INCOME HOUSING — TRUE CASH VALUE — INTEREST INCOME.

The Michigan Tax Tribunal did not err in including interest income produced by the cash reserve account of a low-income housing apartment complex in the total income per year when determining the true cash value of the complex even though the cash reserve account was under the control of the Michigan State Housing Development Authority.

3. TAXATION — TRUE CASH VALUE — BURDEN OF PROOF — TAX TRIBUNAL.

The burden of proof is on the taxpayer to establish the true cash

value of its property; nevertheless, the Tax Tribunal is obligated to make an independent determination of true cash value, utilizing the approach that provides the most accurate valuation under the circumstances of the case.

4. TAXATION — TRUE CASH VALUE — LOW-INCOME HOUSING — CAPITALIZATION RATE — ARTIFICIALLY LOW INTEREST RATES.

The Tax Tribunal's use of an artificially low loan interest rate as the loan interest rate factor in a mortgage-equity equation for ascertaining the capitalization rate in determining the true cash value of a federally subsidized low-income housing project was not error where the Tax Tribunal's decision was rendered prior to the Supreme Court's decision in *Washtenaw County v State Tax Comm*, 422 Mich 346; 373 NW2d 697 (1985).

*Michaelene K. Young,* for petitioner.

*Westrate & Holmstrom* (by *Mark A. Westrate*), for respondent.

Before: M. J. KELLY, P.J., and BEASLEY and P. EDWARDS,* JJ.

PER CURIAM. Dowagiac Limited Dividend Housing Association, petitioner and owner of Vineyard Place, appeals from the decision of the Michigan Tax Tribunal that increased the property's assessment for the 1982, 1983 and 1984 tax years. We affirm.

Petitioner is the owner of twenty acres of land on which it built Vineyard Place, a 120-unit apartment complex that was completed in 1981. The complex was completely financed with funds from the Michigan State Housing Development Authority (MSHDA), which agreed to undertake and carry the mortgage after petitioner had a commitment from the FHA to provide housing assistance payments to support the project. Seventy-five percent of Vineyard Place is occupied by very low income

* Recorder's Court judge, sitting on the Court of Appeals by assignment.

families with twenty-five percent of the complex set aside for low-income families.

I

The complex was financed by a mortgage loan and a capital contribution by Dowagiac LDHA. The cost of the development was $5,078,092. The forty-year term mortgage loan was in the amount of $4,938,561 and the interest rate was 9.65 percent.

The loan was obtained through MSHDA, a public body created by the State Housing Development Authority Act of 1966, MCL 125.1401 et seq.; MSA 16.114(1) et seq. The act was passed, in part, to help take advantage of federal funds available for low-income housing.

In exchange for the loan, the petitioner agreed to regulation by MSHDA, which included a limited return on initial equity investment of six percent per annum, a guarantee by petitioner that expenses would not exceed approved levels, and a restriction that access be limited to tenants of low and very low income.

Through use of the MSHDA loan, the project was eligible for and operated as part of the § 8 program of the Federal Housing Act (designed to aid low-income families), 42 USC 1437f(a). Under this program rents charged are federally regulated by Housing Assistance Payments contracts, which also provide federal rental subsidies; rent levels are based on the cost of new construction, not market rates; and monthly bills for rental subsidies are submitted to MSHDA, which then audits the bills and adjusts the amount billed for debt service, taxes, insurance, and replacement reserve funds.

The project's first year of operation was 1981. The assessment issued by the respondent for tax

year 1982 was $1,979,050. Petitioner timely pro-
tested this assessment and subsequently amended
the petition to include the 1983 and 1984 assess-
ment years where the assessments were $1,979,050
and $1,715,800 respectively. Subsequent to the
granting of Cass County's motion to intervene,
evidentiary hearings on the assessments began. On
August 2, 1985, the Michigan Tax Tribunal en-
tered an opinion and judgment that adopted, with
some modification, respondent's income approach
to valuation.

A comparison of the true cash values advanced
by petitioner and respondent to that determined
by the Tax Tribunal is as follows:

| True Cash Value | 1982 | 1983 | 1984 |
| --- | --- | --- | --- |
| Per Petitioner | $1,600,000 | $1,700,000 | $1,800,000 |
| Per Respondent | 4,561,000 | 4,764,300 | 4,960,000 |
| Per Tax Tribunal | 4,550,672 | 4,827,647 | 4,777,870 |

II

On appeal, petitioner argues that the Tax Tribu-
nal's determination of true cash value was an
error of law. The first error the petitioner finds
with the Tax Tribunal's determination of true cash
value is in the inclusion of rental subsidies in the
Tax Tribunal's calculation under the income capi-
talization approach to true cash value. Petitioner
argues that the rental subsidies were not relevant
to true cash value because those subsidies were
attributable to the benefit of the tenants and not
to the income of the owner. Without the rental
subsidy, petitioner concludes the income before
expenses for tax years 1982, 1983 and 1984 was
$368,500, $397,900, and $410,220 respectively. The
Tax Tribunal, including the rental subsidies as
income, computed the total income before expenses
as $711,360, $774,698, and $781,867 respectively.

Petitioner relies on *Congresshills Apts v Ypsilanti Twp (After Remand)*, 128 Mich App 279; 341 NW2d 121 (1983), for the proposition that a subsidy cannot be incorporated in any way in arriving at true cash value. Petitioner's reliance is misplaced. The issue in *Congresshills* was the interest subsidy that was taken into account in calculating the capitalization rate for the property. The basis for the holding in *Congresshills* was that "interest subsidy is an intangible asset or benefit which cannot properly be subject to taxation as 'real' or 'tangible' property under Const 1963, art 9, § 3." *Id.* at 283. Here what was taken into account in reaching true cash value was the rental subsidy provided by the federal government. This subsidy was no more intangible than the actual rents paid by the tenants. A review of the regulatory agreement does not reveal any use restrictions on the rental subsidies, beyond their use as a method for making mortgage loan and other payments due MSHDA. The substance of the subsidy as it pertains to the project was rental income.

> [C]ourt review of decisions of the Tax Tribunal, in the absence of fraud, is limited to determining whether the tribunal made an error of law or adopted a wrong principle; the factual findings of the tribunal are final, provided that they are supported by competent and substantial evidence. [*Antisdale v City of Galesburg*, 420 Mich 265, 277; 362 NW2d 632 (1984). See also Const 1963, art 6, § 28.]

We find no error of law in the Tax Tribunal's use of the value of the rent subsidy in calculating true cash value.

Petitioner also argues that the Tax Tribunal erred in including interest income produced by the cash reserve account under the control of MSHDA

in the total income per year of the complex. For tax years 1983 and 1984, the Michigan Tax Tribunal added interest income of $18,003 and $13,672 respectively. This interest was derived from the replacement reserve funds which were administered by MSHDA as part of the mortgage escrow asset account which was established by the regulatory agreement.

Petitioner's claim is that the interest income was produced by cash reserve accounts under the control and possession of MSHDA and which were not listed as owner assets. In general, petitioner claims the Michigan Tax Tribunal erred in valuing a going concern rather than realty.

However, in petitioner's computation of true cash value under the income approach, the interest income was listed and included in reaching true cash value. In *Southfield Western, Inc v Southfield,* 146 Mich App 585; 382 NW2d 187 (1985), lv den 425 Mich 855 (1986), this Court found no error in the Tax Tribunal's refusal to deduct the going concern value of a hotel business from the true cash value of the realty, where the petitioner failed to meet its burden of proving the existence of a separate and intangible business value and failed to cite any authority in support of such a deduction or the method for measuring the intangible business value. Similarly, petitioner here has failed to meet this burden. See MCL 205.737(3); MSA 7.650(37)(3).

From the evidence produced we conclude the Tax Tribunal did not adopt a wrong legal principle in computing the amount of net operating income.

III

Next, petitioner contends the Tax Tribunal committed an error of law in adopting a capitalization

rate that used a formula that included the government mortgage rate and flawed sales data. In its opinion, the Tax Tribunal accepted the respondent's capitalization rate. Under the capitalization-of-income approach to valuation, an appraiser converts a stream of income into a value for the entire property and determines an appropriate rate of return. This is the capitalization rate and determining this rate is the most difficult factor in determining valuation under the capitalization-of-income approach. *Tradewinds East Associates v Hampton Charter Twp,* 159 Mich App 77, 84; 406 NW2d 845 (1987). "[T]he lower the capitalization rate, the higher the value of the property and vice versa." *Id.* Respondent utilized the mortgage-equity technique in arriving at its capitalization rate.

In using the mortgage-equity method for reaching a capitalization rate, six factors are blended together in an algebraic formula. The factors are: (1) Holding period, a limited term of ownership before selling, refinancing or exchanging the property; (2) Equity-yield rate, the rate of return to maturity on dollars actually invested; (3) Loan term, the dollar amount of the mortgage as a percentage of the value or purchase price. (4) Loan term, length of loan in terms of years; (5) Loan interest rate; and (6) Appreciation/depreciation, estimated percentage of possible change in property value within the projected holding period. See I. Johnson, *Instant Mortgage-Equity,* (Lexington, Mass: DC Heath & Co, 1980), p 73. The six component parts are derived from the market that the property falls into, in this case the subsidized submarket of low-income housing. The Michigan Tax Tribunal plugged the following figures into the six factors: (1) holding period equals five years; (2) equity-yield rate equals six percent; (3) loan

term is ninety percent; (4) loan term length is forty years; (5) loan interest rate is 9.65 percent; and (6) appreciation/depreciation is zero percent.

Petitioner's first contention is that the value of the cash flow produced to the owner by the tax shelter should have been included in the equity-yield rate. Petitioner argues that only by recognizing this benefit in the equity-yield rate can the Michigan Tax Tribunal determine the present value of the future income stream from the tax shelter. The equity-yield rate set by the Michigan Tax Tribunal was six percent. This rate was equivalent to the maximum return on investment allowed petitioner under the MSHDA agreement.

The burden of proof is on the taxpayer to establish the true cash value of its property. MCL 205.737(3); MSA 7.650(37)(3). The Tax Tribunal, however, is obligated to make an independent determination of true cash value, utilizing the approach that provides the most accurate valuation under the circumstances of the case. *Antisdale, supra* at 277. If neither party's valuation figure is accurate, the tribunal is free to reject both; however, it should not substitute some other figure which may be equally lacking in evidentiary support. *Clark Equipment Co v Leoni Twp,* 113 Mich App 778, 786-787; 318 NW2d 586 (1982).

Although petitioner also used (as one alternative) an income approach for determining true cash value and concluded that such an approach was the most appropriate method for ascertaining true cash value, when it presented its argument to the Michigan Tax Tribunal on this approach to valuation petitioner did not use the mortgage-equity method for determining the capitalization rate. Consequently, petitioner did not present evidence to the Tax Tribunal that the equity-yield factor used in computing the capitalization rate

under the mortgage-equity equation should be anything other than six percent. Since the burden of proof is on the taxpayer to establish true cash value, since petitioner here failed to address this component used to reach true cash value, and since competent evidence was presented by respondent on this factor, we find no error in the Tax Tribunal's adoption of this figure.

Similarly, petitioner challenged the holding period used by the Tax Tribunal. Theoretically the holding period represents the time that a typical investor would hold an investment prior to selling or refinancing it. This factor, used in computing the capitalization rate by way of the mortgage-equity equation, was determined by respondent to be five years. This determination was based on resales of seven similar subsidized properties, apparently the only data available on similar properties.

Here again, since petitioner ignored the fact that this was subsidized housing in their income approach and failed to address the mortgage-equity theory for arriving at a capitalization rate, no alternative to this five-year holding period factor was presented to the Michigan Tax Tribunal. Petitioner did not meet its burden, and we find no error in the Michigan Tax Tribunal's use of respondent's figure, although it is based on the extremely limited information of seven other properties similarly situated.

In view of the evidentiary record which was presented to the Michigan Tax Tribunal we are unable to conclude that the tribunal adopted a wrong principle in adopting respondent's overall capitalization rate despite the difficulty with the factual basis for the holding period.

Petitioner also argues that the Michigan Tax Tribunal erred in using the actual government

financing instrument to determine the loan interest rate factor in the mortgage-equity equation for ascertaining the capitalization rate. The MSHDA loan interest rate was 9.65 percent. Petitioner contends this factor, the loan interest rate, should be developed from the market, otherwise it has no true market reference. Petitioner contends that, by adopting the actual financing for this factor, there is a complete lack of market reference to determine true cash value according to the basic assumptions of the income approach because MSHDA is not a market debt investor and the rate it set on the loan was artificially low.

But for the prospective application given *Washtenaw Co v State Tax Comm,* 422 Mich 346, 365; 373 NW2d 697 (1985), which was decided after the August 2, 1985, decision by the Michigan Tax Tribunal in this case, where a method of valuation that separates the cost of artifically low financing from the sale price to arrive at true cash value is required (when a seller contributes significantly to the buyer's ability to finance at low market rates), we would be obliged to agree with petitioner. However, because that decision is inapplicable here, we do not find the Michigan Tax Tribunal adopted a wrong legal principle in using the actual 9.65 percent financing charge.

Petitioner also claims the Michigan Tax Tribunal erred in adopting a zero percent appreciation/depreciation factor in the mortgage-equity equation used to reach a capitalization rate. Typically this factor in a mortgage-equity method for reaching a capitalization rate should be derived from a study of the subject property and other properties in the vicinity with the objective of detecting trends in value. The zero factor used here indicates stability. Respondents used the zero factor

because there were only limited sales data to evaluate.

The capitalization rate reached by use of the mortgage-equity equation exceeded eleven percent for each tax year in question. (For tax year 1982 the capitalization rate was .1191, for 1983 it was .1190, and for 1984 it was .1188). Given the evidentiary record, we are unable to conclude a wrong principle was used in deciding the overall capitalization rate.

IV

Petitioner also argues that the Michigan Tax Tribunal violated the basic principle that all three approaches to value are valid if appropriately applied.

> Generally, there presently are three methods of valuation which are acceptable to the Michigan Tax Tribunal and the courts. They are the cost-less-depreciation approach, the capitalization-of-income approach, and the market approach. . . . It is the duty of the Tax Tribunal to select the approach which provides the most accurate valuation under the circumstances of the individual case. [*Antisdale, supra* at 276-277.]

Here both petitioner and respondent concluded that the capitalization-of-income approach was the most appropriate method of valuation of this property. The Tax Tribunal adopted this method and we find no error in that decision.

V

Petitioner has also claimed that, in the event this Court decides that it is proper to consider the subsidized nature of the complex (as we have), we

should declare that this project has no value because it has been completely restricted out of the real estate market.

This claim is without merit. Petitioner argued before the Tax Tribunal that Vineyard Place had substantial value (by their estimation well in excess of $1,000,000), although they put the value at less than what respondent and the Michigan Tax Tribunal judged it to be. Petitioner had the burden of establishing true cash value and attempted to do so. Petitioner cannot now on appeal raise this new argument, contending the complex has zero value.

Affirmed.